UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

EUGENE YOUNGBLOOD,                              :

                    Petitioner,       :        **OPINION**

            - against -               :        05 Civ. 9897 (DC)

W. BROWN, Superintendent of the       :
Eastern New York Correctional
Facility,                             :        USDC SDNY
                                               DOCUMENT
                    Respondent.       :         ELECTRONICALLY FILED
- - - - - - - - - - - - - - - - -X             DOC #:
                                               DATE FILED: 12/1/06

**APPEARANCES:**   EUGENE YOUNGBLOOD
                   Petitioner Pro Se
                   Fishkill Correctional Facility
                   P.O. Box 1245
                   Beacon, New York  12508

                   ROBERT T. JOHNSON, ESQ.
                   District Attorney, Bronx County
                   Attorney for Respondent
                        By: Dana S. Weisel, Esq.,
                            Brian J. Pollock, Esq.,
                            Assistant District Attorneys
                   198 East 161st Street
                   Bronx, New York  10451

**CHIN, D.J.**

            Pro se petitioner Eugene Youngblood petitions this

Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Youngblood was convicted on September 11, 1997, following a jury

trial in the Supreme Court of New York, Bronx County, of two

counts of Robbery in the First Degree.  He was sentenced to an

indeterminate term of 12 1/2 to 25 years imprisonment.

            Youngblood contests his conviction on the following

grounds: (1) the indictment was jurisdictionally defective; (2)

there was a Batson violation of his equal protection rights; (3)

the trial court improperly excluded evidence; (4) his Sixth Amendment confrontation clause rights were violated; (5) the trial court erroneously admitted evidence of uncharged criminal conduct without a limiting instruction; (6) the prosecution's summation violated his constitutional right to a fair trial; (7) his conviction was based on insufficient evidence; and (8) he was denied effective assistance of appellate counsel.[1]  For the reasons that follow, the petition is denied.

**BACKGROUND**

I.   **The Facts**

The following is a summary of the facts adduced at trial.

A.   **The Robberies**

On June 27, 1991, Carol Rendon was robbed on the northbound number 5 subway train between the 138th and 149th Street stations.  She was alone in the second to last car on the train.  While she was looking at the map on the wall of the train, Youngblood entered the car.  Youngblood approached Rendon, grabbed her and "flung" her into a seat, then sat down next to her.  Youngblood took a knife out and put it towards Rendon's right side, demanding that she give him her money.  When Rendon

_____

[1]  Youngblood alleged grounds (2), (3), and (4) in his reply, but not in his initial petition.  Because Youngblood is proceeding pro se, his pleadings should be construed liberally. See Phillips v. Girdich, 408 F.3d 124, 127-28 (2d Cir. 2005). The Court therefore addresses these grounds in deciding this petition.  See id.

said she had no money, Youngblood took her pocketbook and put it in a large black bag he was carrying.  Youngblood then began touching her breasts and genitals, but Rendon slapped his hand away.  As the train stopped, Youngblood stood up, told Rendon to sit still and be quiet, and then ran off the train.  (Tr. 763-65).[2]

Once Youngblood was gone, Rendon got off the train and went to the tollbooth.  She told the tollbooth clerk that she had been robbed and the clerk called the police.  Police officers responded.  She was taken to the police station, where she gave a description of Youngblood and the blade of the knife he used, which was the only part of the knife she was able to see.  She described Youngblood as a six-foot-tall black man in his thirties with a medium muscular build, wearing black sunglasses, a white T-shirt, dark blue shorts and black sneakers, and carrying a black bag.  (Tr. 768-69, 778-80, 825, 874-75).

Twelve days later, on July 9, 1991, Elsie Ruiz entered the last car of the northbound number 4 train at 125th Street. Youngblood entered the car as well and sat down at the other end of the car from Ruiz.  They were the only two people in the car. When the train began moving, Youngblood got up and came towards Ruiz with a knife.  He put it in Ruiz's face and told her to give him her chain.  When Ruiz froze, Youngblood grabbed the chain, then pulled her bag off her shoulder and demanded her watch.

---

[2]     References to "Tr." are to pages of the transcript of Youngblood's second trial.

Youngblood began touching Ruiz's breasts and leg, but she pushed his hand away.  (Tr. 592, 618).

Youngblood next told Ruiz to lie on the floor and stay there, then got off at the 138th Street Station.  As Youngblood walked away, Ruiz stood up and asked for her ID back, and he started back towards her.  Ruiz began to yell that she was being robbed, and two police officers on the platform approached and arrested Youngblood.  The officers recovered a knife, Ruiz's jewelry, bag, and the contents of her bag from Youngblood.  (Tr. 592-93, 640-41).

The knife that the officers recovered was a gravity knife which could be opened by flipping the wrist.  Once opened, the knife locked into position and a lever had to be pressed to close it.  (Tr. 1027-28).

B.   **The Investigation and Line-Up**

Because Ruiz was present when Youngblood was arrested, there was no identification issue and no need for her to identify him in a line-up.

After the arrest, Rendon was brought to the police station and viewed a lineup containing Youngblood and five other men.  All the men in the line-up were seated with a blanket over their legs, and all wore sunglasses.  Rendon asked them to approach the glass.  She left the room while the police removed the blankets and had the men wearing long pants roll up the pant legs so it looked like they were wearing shorts.  Rendon returned and identified Youngblood as her attacker.  (Tr. 769-75, 904).

## II.   Procedural History

### A.   The Indictment

On August 8, 1991, Youngblood was indicted in the Supreme Court of New York, Bronx County, on six counts of Robbery in the First Degree, three counts of Grand Larceny in the Fourth Degree, three counts of Criminal Possession of Stolen Property in the Fifth Degree, two counts of Sexual Abuse in the First Degree, three counts of Criminal Possession of a Weapon in the Fourth Degree, and one count of Assault in the Third Degree.

### B.   The First Trial

On May 27, 1993, after a jury trial, Youngblood was convicted on two counts of Robbery in the First Degree and one count of Criminal Possession of Stolen Property in the Fifth Degree.  He was sentenced to consecutive indeterminate terms of 12 1/2 to 25 years.[3]  On March 12, 1996, the Appellate Division, First Department, reversed Youngblood's conviction on the ground that the trial court failed to respond properly to Youngblood's motion to represent himself.  People v. Youngblood, 638 N.Y.S.2d 658 (1st Dep't 1996).

### C.   The Second Trial

On June 18, 1997, Youngblood's retrial on the two counts of Robbery in the First Degree began with jury selection. He was represented by Alix Mondesir, Esq.

---

[3]    Youngblood was sentenced only on the two Robbery counts, not on the Criminal Possession count.

1.   **Voir Dire**[4]

A jury pool of 52 was initially brought into court for voir dire, and 25 were excused with the consent of both parties.[5] Of the remaining 27, 14 were seated in the jury box for further voir dire.  Among them were six whites and five African-Americans.  After the court elicited pedigree information from the 14 jurors, the prosecutor began her voir dire, asking individual jurors very specific questions directed toward anticipated trial issues.  Mondesir did not address individual jurors, but instead asked the group as a whole to concur with his generalized statements.  At the end of the voir dire, two white jurors and one Latino juror were excused for cause without objection.  The prosecutor then exercised four peremptory challenges, all of which were against African-Americans. Mondesir peremptorily challenged seven jurors, four of whom were white and one of whom was African-American.  Between all the peremptory challenges exercised, no potential jurors remained from the group.

At this point, Mondesir suggested that the court make an inquiry into the fact that the only two African-American women

---

[4]   During voir dire a Batson issue arose, resulting in a written decision from which these facts are taken.  People v. Youngblood, No. 5425/91 (N.Y. Sup. Ct., Bronx Co., Sept. 3, 1997).

[5]   While the decision states that 27 jurors were excused, it appears that 25 were actually excused based on the number of jurors remaining for further voir dire.  This discrepancy does not affect the Court's analysis.

on the panel had been peremptorily challenged by the prosecutor. The court, however, declined, finding that no meritorious Batson issue was raised and that two people did not establish a discriminatory pattern.

In the second round of voir dire the remaining 13 potential jurors from the original pool were seated.  Four were white and seven were African-American.  The method of voir dire remained the same.  There were no challenges for cause in this round.  The prosecutor peremptorily challenged three jurors, all of whom were African American.  Prior to the defense's peremptory challenges, the prosecutor advised the court that she would raise a reverse Batson challenge on the basis of a pattern of discrimination by the defense.  Mondesir then exercised five peremptory challenges, against four whites and one African-American.

Subsequently, the prosecutor formally raised the reverse Batson challenge, pointing to Mondesir's exclusion of all the remaining white potential jurors.  She requested that the court reseat some potential jurors excluded by the defense.  The court found that the exclusion of white potential jurors sufficiently raised a pattern of discrimination and asked Mondesir to give race-neutral explanations for his peremptory challenges.  Mondesir objected to the court's finding, but gave explanations for each of his challenges against white potential

jurors.[6]  The court considered these explanations together with the generalized way in which Mondesir had conducted his voir dire.  Because Mondesir did not obtain specific information from individual jurors to connect their thoughts to the facts of the case, the court concluded that defense counsel could not support his race-neutral explanations.  The explanations were thus found to be pretextual, and a reverse <u>Batson</u> violation was found.  The court asked Mondesir for his thoughts as to an appropriate remedy, but he declined to suggest any.  Opting for the prosecutor's suggested remedy, the court reseated two of the last four white jurors challenged, who were the only ones available for reseating.

Next, a third round of jury selection was conducted. When the parties went to the robing room to exercise challenges, Mondesir requested a mistrial.  He argued that he had been the first to raise a <u>Batson</u> challenge and yet was penalized for it. In response, the court told him that he had not raised a proper <u>Batson</u> challenge, but noted the number of African-American jurors excluded by the prosecutor.  Mondesir then requested that the court reseat some of the African-American jurors.  This not feasible, however, because Mondesir had not properly raised a

---

[6]     One juror was excluded because her son was a former Assistant United States Attorney, and Mondesir felt that she would favor the prosecution.  Two were excluded because they were teachers; Mondesir felt one was too preoccupied with her job and the other would lead the other jurors.  Two were social workers, and Mondesir acknowledged he was biased against their profession. Two did not have enough life experience to his liking.  One was an accountant and "might relate to 'Smith Barney's' statistical analysis."

<u>Batson</u> challenge and those excluded jurors were no longer available for reseating.  In the end, the jury that sat through the trial consisted of seven African-Americans, five whites, and three Latinos (12 jurors and 3 alternates).

### 2.   **Testimony of Carol Rendon**

During Rendon's examination on direct, she was asked about the knife Youngblood used during the robbery.  (Tr. 780-82).  Rendon was able to describe the blade, but she had not seen the handle because Youngblood's hand was covering it.  (Tr. 780).  When shown the knife taken from Youngblood after the Ruiz robbery, Rendon testified that it looked like the knife Youngblood had.  (Tr. 781-82).

### 3.   **Youngblood's Motion to Dismiss**

At the close of the prosecution's case, Youngblood moved to dismiss the second charge of Robbery in the First Degree.  He argued that the prosecution failed to prove that he brandished a "deadly weapon" at Rendon, a necessary element of the crime.  The court denied the motion, finding that there was sufficient evidence for the jury to consider.

### 4.   **The Prosecution's Summation**

During the prosecutor's summation, she referred to Youngblood's groping of the two women during the robberies.  Both women had testified during the trial that Youngblood touched their breasts and genitals during the course of the robbery.  (Tr. 618, 764).  The prosecutor restated their testimony, which

- 9 -

was a matter of record and had already been heard by the jury.

### 5.   The Verdict and Sentence

The jury returned a guilty verdict, convicting Youngblood of two counts of Robbery in the First Degree.  He was sentenced on September 11, 1997, to 12 1/2 to 25 years imprisonment.

### D.   The Appeals

Youngblood filed a timely notice of appeal on September 12, 1997.  On November 9, 1999, the Appellate Division granted Youngblood permission to prosecute his appeal as a poor person and assigned The Legal Aid Society to represent him.  On March 20, 2001, the Appellate Division relieved The Legal Aid Society and assigned Michael Lipson, Esq. as successor counsel.

On June 10, 2002, Lipson filed a brief on Youngblood's behalf, raising four claims: (1) the indictment was jurisdictionally defective; (2) the conviction was based on insufficient evidence; (3) the trial court erroneously admitted evidence of uncharged criminal conduct without a limiting instruction; and (4) the prosecution's summation violated Youngblood's constitutional right to a fair trial.[7]  On July 11, 2002, Youngblood filed a motion requesting an order permitting him to file a pro se supplemental brief.  On November 7, 2002, the Appellate Division, First Department, denied the motion and, by order dated April 3, 2003, affirmed Youngblood's conviction.

_____

[7]   These claims are identical to those raised by Youngblood in the instant motion.

- 10 -

People v. Youngblood, 757 N.Y.S.2d 40 (1st Dep't 2003).  By order
dated April 3, 2003, Youngblood petitioned the New York Court of
Appeals for leave to appeal.  The petition was denied on August
22, 2003.

On November 16, 2004, Youngblood, acting pro se,
petitioned the Appellate Division for a writ of error coram
nobis, alleging that Lipson was ineffective in failing to argue
that (1) the trial court reversibly erred by not finding a Batson
violation by the prosecution, and (2) the trial court deprived
Youngblood of a fair trial by admitting certain evidence.  On
July 7, 2005, the Appellate Division denied the petition, and the
New York Court of Appeals denied leave on October 25, 2005.

### E.    The Instant Petition

This petition, dated October 28, 2005, was received by
the Court's Pro Se office on November 7, 2005.  Respondent filed
opposing papers on February 21, 2006, and Youngblood filed a
reply, dated May 23, 2006.

### DISCUSSION

### I.    Federal Review of State Convictions

The Antiterrorism and Effective Death Penalty Act of
1996 ("AEDPA") "placed a new restriction on the power of the
federal courts to grant writs of habeas corpus to state
prisoners." Williams v. Taylor, 529 U.S. 362, 399 (2000).  AEDPA
sets forth new standards of review that make it more difficult
for a habeas petitioner to obtain federal relief from a state

- 11 -

conviction.  It provides that:

> An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to any
> judgment of a State court shall not be
> granted with respect to any claim that was
> adjudicated on the merits unless the
> adjudication of the claim:
>
> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on
> an unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d)(1), (2).

AEDPA has been interpreted to require a petitioner to
show not only that clearly established federal law was
erroneously or incorrectly applied, but that the application was
unreasonable.  See Williams, 529 U.S. at 411; see also Lockyer v.
Andrade, 538 U.S. 63, 66 (2003); Bell v. Cone, 535 U.S. 685, 688
(2002).  As the Second Circuit has explained, "[a] state court
decision is 'contrary to' Supreme Court precedent only if it
either 'arrives at a conclusion opposite to that reached by [the
Supreme Court] on a question of law' or 'confronts facts that are
materially indistinguishable from a relevant Supreme Court
precedent' and arrives at [the opposite result]."  Lainfiesta v.
Artuz, 253 F.3d 151, 155 (2d Cir. 2001) (quoting Williams, 529
U.S. at 405).  The standards set forth by AEDPA apply to all
habeas petitions filed after the statute's effective date of

- 12 -

April 24, 1996.  See Boyette v. Lefevre, 246 F.3d 76, 88 (2d Cir. 2001) (citing Williams, 529 U.S. at 402).

AEDPA also specifies the applicable standard for federal review of state-court factual findings: a petitioner must demonstrate that a decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  In habeas proceedings, a "determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1). The petitioner has the burden of rebutting this presumption "by clear and convincing evidence."  Id.

Youngblood's petition is timely, as he filed it within a year of his conviction becoming final.  See 28 U.S.C. § 2244(d)(1)(A).  Though it appears he has failed to exhaust some of his claims, I nevertheless discuss each on the merits.  See Jones v. Conway, 442 F. Supp. 2d 113, 123 (S.D.N.Y. 2006).

## II.  **The Merits**

Youngblood raises eight claims for federal habeas corpus review: (1) a defective indictment, (2) a Batson violation of the equal protection clause, (3) improper exclusion of evidence, (4) a violation of his Sixth Amendment confrontation clause rights, (5) the admission of uncharged criminal conduct and lack of limiting instruction, (6) prosecutorial misconduct, (7) insufficient evidence to support his conviction, and (8) ineffective assistance of appellate counsel.

## A.    __Defective Indictment__

Because the indictment here merely alleged that he was armed with a "knife," Youngblood contends that both counts of the indictment failed to allege a material element of First Degree Robbery.  In New York, a defendant can be charged with Robbery in the First Degree "when he forcibly steals property and when, in the course of the commission of the crime or the immediate flight therefrom, he . . . is armed with a deadly weapon."  New York Penal Law § 160.15(2).  A "gravity knife" is specifically included in the Penal Law's definition of a deadly weapon; the definition does not, however, include all knives or a generic "knife."  See New York Penal Law § 10.00(12).  Thus, Youngblood argues that the indictment was defective, thereby depriving the trial court of jurisdiction to convict and sentence him.

The Supreme Court has found that "defects in an indictment do not deprive a court of its power to adjudicate a case."  United States v. Cotton, 535 U.S. 625, 631 (2002).  The Second Circuit has held that

> [a]n indictment is sufficient when it charges a
> crime with sufficient precision to inform the
> defendant of the charges he must meet and with
> enough detail that he may plead double jeopardy in
> a future trial based on the same set of events
> . . . . [C]ommon sense must control and . . . an
> indictment must be read to include facts which are
> necessarily implied by the specific allegations
> made.

United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (quotations omitted).

- 14 -

Here, the indictment gave Youngblood enough information to mount his defense.  Youngblood had notice of the crime with which he was being charged even though the indictment used the term "knife," rather than "gravity knife."  The failure of the indictment to specify that Youngblood was armed with a "gravity knife" did not render it defective, as the indictment specifically charged use of a "deadly weapon."  Accordingly, this claim is denied.

B.   **The Trial Court's Batson Rulings**

1.   **Applicable Law**

To establish a prima facie case of discrimination under Batson, the moving party must show that the non-moving party's exercise of peremptory challenges was based on race.  See McKinney v. Artuz, 326 F.3d 87, 97 (2d Cir. 2003).  Once this showing is made the burden shifts to the non-moving party to give a race-neutral explanation for its challenges.  Id.  Finally, the trial court decides whether the moving party showed by a preponderance of the evidence that the peremptory challenges were based on race.  Id. at 98.

There are no fixed rules for determining what evidence will support a Batson claim.  See Batson v. Kentucky, 476 U.S. 79, 96-97 (1986).  The trial courts are presumed to be in the best position to decide based on all of the relevant circumstances.  Id.  The exclusion of members of a cognizable racial group gives rise to an inference of discriminatory intent, but the trial court must make a decision in light of the non-

moving party's explanations for the challenges as well as its acceptance of jurors with similar circumstances.   See United States v. Alvarado, 923 F.2d 253, 256 (2d Cir. 1991).

> 2.   **Application**

> a.   **Youngblood's Batson Claim**

Although respondent argues that Youngblood's Batson claim was unpreserved for appeal, I evaluate the claim on the merits nonetheless.

Youngblood argues that the prosecution impermissibly discriminated against African-American potential jurors during voir dire.  He contends that there was a pattern of discriminating peremptory challenges against African-Americans, and the trial court erred in not finding a Batson violation.

The trial court found that even if Youngblood's trial counsel had properly raised a Batson objection, no Batson violation existed.  Through two rounds, the prosecutor used peremptory challenges on seven of twelve African-American prospective jurors.  While these numbers could indicate a discriminatory pattern by the prosecution, the trial court considered its explanations and all other relevant circumstances. Given the parties' methods of voir dire and the fact that seven African-Americans were on the final jury, the trial court's finding that there was no Batson violation was not an unreasonable application of federal law; its ruling therefore provides no basis for habeas relief.

### b.   The Prosecution's Reverse Batson Claim

Youngblood also argues that the trial court erred in reseating two white jurors at the prosecution's request.  He contends that those jurors were dismissed for cause and the judge should not have found a reverse Batson violation.

Mondesir used his peremptory challenges on at least eight white prospective jurors, and at one point struck all the remaining white prospective jurors in the box.  He attempted to give race-neutral reasons for his challenges, but the trial court found them pretextual, in part because of his method of conducting voir dire.  He did not ask the challenged jurors questions individually, and thus was not in a good position to assess how their beliefs would impact their view of the case. His stated reasons were, for the most part, far from concrete. Therefore, it was not unreasonable for the trial court to conclude that defense counsel had an impermissible motive for dismissing all of the white potential jurors.

Nor did the trial court err in reseating two of the white jurors.  Mondesir was asked to suggest an alternate remedy, but declined to do so.  Reseating two of the impermissibly challenged jurors was appropriate.  See People v. Johnson, 765 N.Y.S.2d 199, 200 (2003) (noting that reseating affected prospective jurors is appropriate remedy after reverse Batson violation).  Youngblood can point to no established Federal law prohibiting the reseating of impermissibly challenged jurors.

- 17 -

Accordingly, the trial court's reverse <u>Batson</u> ruling and
subsequent remedy do not warrant habeas relief.

     **C.    Trial Court's Exclusion of Evidence**

          **1.    Applicable Law**

       To obtain a writ of habeas corpus on the basis of an
evidentiary ruling, a defendant must prove that the excluded
evidence was so "material to the presentation of the defense
. . . as to deprive [him] of fundamental fairness." <u>Rosario v.
Kuhlman</u>, 839 F.2d 918, 924 (2d Cir. 1988).  The excluded evidence
"must be evaluated in the context of the entire record.  If there
is no reasonable doubt about guilt whether or not the additional
evidence is considered, there is no justification for a new
trial." <u>Taylor v. Curry</u>, 708 F.2d 886, 891 (2d Cir. 1983).

          **2.    Application**

       Youngblood argues that the trial court erred in not
admitting the 911 call and the "Sprint" report[8] of Ruiz's robbery
into evidence.  In the precluded 911 tape and Sprint report,
Officer Valentin, the arresting officer at the scene of the
second robbery, stated that the robbery occurred on the
southbound side of the subway platform.  At trial, however,
Valentin testified that the robbery occurred on the northbound
side.  Youngblood argues that the preclusion of this evidence
impermissibly weakened his case and deprived him of a fair trial.

---

     [8]    A Sprint report is a written excerpt of a 911 call or
radio dispatch of an officer at a crime scene.

There was overwhelming evidence in the record, however, of Youngblood's guilt -- he was seen leaving the train, he was apprehended by the police, and he had the gravity knife and Ruiz's bag and jewelry in his possession.  In the face of this evidence, Valentin's mistaken statement on the 911 tape and Sprint report was not enough to introduce a reasonable doubt about Youngblood's guilt.  Therefore, this claim is without merit.

### D.   Youngblood's Confrontation Clause Claim

In his reply, Youngblood appears to be asserting a violation of his confrontation clause rights: "The . . . 6th Amendment . . . as well as evidentiary rules concepts both states [sic] that accused is to be confronted with the witness against him . . . the trial judge just denied everything and denied the Petitioner to [sic] a fair trial."  (Reply at 13).  Youngbood, however, does not give a factual basis for this claim, and there is no evidence to support it.  Hence, habeas relief is not warranted on this ground.

### E.   Uncharged Criminal Conduct Admission and Lack of Limiting Instruction

#### 1.   Applicable Law

Under New York law, evidence of uncharged criminal conduct is inadmissible "if the only purpose of the evidence is to show bad character or propensity towards crime. . . ."  People v. Alvino, 71 N.Y.2d 233, 241 (1987).  If the evidence is probative of a material and legally relevant issue before the

court, it may be admissible as proof of the identity of the
defendant, but it cannot "be received unless its probative value
exceeds the potential for prejudice resulting to the defendant."
Id. at 242.  Admissibility will turn on the discretionary
balancing between the probative value and the potential
prejudice.  Id.

  The standard is the same under federal law.  See Fed.
R. Evid. 404(b).  Even assuming that the admission of uncharged
conduct was erroneous under New York law, the improper admission
of evidence "does not amount to a violation of due process unless
the evidence 'is so extremely unfair that its admission violates
fundamental conceptions of justice.'"  Dunnigan v. Keane, 137
F.3d. 117, 125 (2d Cir. 1998) (quoting Dowling v. United States,
493 U.S. 342, 352 (1990)).  Unless the petitioner can show that
the error "'had substantial and injurious effect or influence in
determining the jury's verdict,'" the verdict must stand.  Brecht
v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v.
United States, 328 U.S. 750, 776 (1946).

### 2. **Application**

  Youngblood argues that the trial court erred in
admitting both Ruiz's and Rendon's testimony that he touched
their breasts and genitals during the robberies, because he was
not charged with sexual assault.  He claims that allowing the
testimony denied him a fair trial and was therefore reversible
error.  Youngblood also argues that if the trial court was going

to admit the testimony, it was required to deliver a limiting instruction to the jury.

The Appellate Division held that the "trial court properly permitted the People to introduce evidence of uncharged criminal conduct since such conduct clearly and convincingly demonstrated a unique modus operandi and was thus relevant to establishing defendant's identity as the perpetrator of the charged robberies." Youngblood, 757 N.Y.S.2d at 40. I agree with this reasoning. Moreover, Youngblood's conduct was part of the sequence of events, and the prosecution was entitled to tell the story as it actually happened.

Even assuming, arguendo, that the trial court erred in admitting the testimony, Youngblood must show that the testimony was "extremely unfair" to merit habeas relief on this ground. The victims' testimony as to the sexual assaults, however, was not extremely unfair. Youngblood's defense was that he was not the perpetrator of the robberies. The victims' testimony showed that the modus operandi in both robberies was the same; if the jury found that Youngblood was responsible for one of the robberies, that finding might help it determine that Youngblood committed the other robbery as well. The evidence that Youngblood robbed Ruiz was overwhelming -- he was arrested as he was attempting to flee the scene, and he was literally caught holding Ruiz's bag.

Nor did the trial court's failure to give a limiting instruction result in a violation of justice or fairness. The

testimony showed that Youngblood had a unique modus operandi and was thus relevant. Id. Even assuming the trial court erred in not giving a limiting instruction, it was harmless error. See Mitchell v. Herbert, No. 97 Civ. 5128 (DC), 1998 WL 186766, at *4 (S.D.N.Y. Apr. 20, 1998). Therefore, Youngblood's request for habeas relief on this ground is denied.

### F.   **Prosecutorial Misconduct**

#### 1.   **Applicable Law**

When reviewing habeas claims brought by state prisoners, federal courts must distinguish between those premised upon prosecutorial misconduct for "'ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process.'" Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647-48 (1974) (citations omitted)); see Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986) (question is whether "the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair.") Improper remarks at summation "must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." United States v. Young, 470 U.S. 1, 12 (1985).

#### 2.   **Application**

Youngblood claims that the prosecutorial misconduct occurred during the prosecution's summation, when the prosecutor

stated that Youngblood sexually abused the two victims.  He
argues that this statement denied him a fair trial.

The jury had already heard the two victims testify that
Youngblood touched their breasts and genitals during the
robberies.  Thus, the prosecutor's summation did not introduce
new evidence, but, rather, recounted facts already in the record,
facts that were properly part of the record.  The use of evidence
already in the record did not make the trial "fundamentally
unfair" so as to deny Youngblood constitutional due process.  See
Garofolo, 804 F.2d at 206.  Youngblood's request for habeas
relief on this ground is denied.

### G.   Insufficient Evidence to Support Conviction

#### 1.   Applicable Law

In evaluating a claim of insufficiency of evidence, a
federal court must review the evidence in a light most favorable
to the prosecution.  Jackson v. Virginia, 443 U.S. 307, 319
(1979).  A guilty verdict must be affirmed if any "'rational
trier of fact could have found the essential elements' of the
charged crime 'beyond a reasonable doubt.'"  United States v.
Salmonese, 352 F.3d 608, 618 (2d Cir. 2003) (quoting Jackson, 443
U.S. at 319).  In cases where the facts support conflicting
inferences, the reviewing court must presume that the jury
"resolved any such conflicts in favor of the prosecution, and
must defer to that resolution."  Jackson, 443 U.S. at 326; see
also United States v. Chacko, 169 F.3d 140, 148 (2d Cir. 1999).

### 2. **Application**

Youngbood claims that his conviction was based on evidence that was legally insufficient to support a conviction for First Degree Robbery for the Rendon robbery.

At trial, the prosecution proved that Youngblood was caught in possession of a gravity knife at the scene of the second robbery. Youngblood did not challenge the admission of that knife into evidence as People's Exhibit Two or Officer Valentin's assessment of that knife as a gravity knife, and he does not contest the sufficiency of the evidence for that robbery.

At trial, Rendon stated that Youngblood used a knife during the first robbery and that People's Exhibit Two looked like the knife he possessed, though she had seen only the blade during the robbery. (Tr. 764, 780-82). From this evidence, a rational trier of fact could have concluded that Youngblood "forcibly [stole] property . . . and . . . in the course of the commission of the crime . . . [was] armed with a deadly weapon." New York Penal Law § 160.15(2). Moreover, the Appellate Division found that the verdict was based on sufficient evidence. See Youngblood, 757 N.Y.S.2d at 40. Such a finding is not contrary to established federal law. Youngblood fails to meet the "heavy burden" required to show that his petition should be granted on the grounds of insufficient evidence. See Chacko, 169 F.3d at 148.

### H.    Ineffective Assistance of Counsel

### 1.    Applicable Law

To prove ineffective assistance of counsel, Youngblood must show that (1) his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) he was prejudiced by counsel's deficient performance.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984); United States v. Vegas, 27 F.3d 773, 777 (2d Cir. 1994).  To demonstrate prejudice, Youngblood must show that, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding would have been different.  See Strickland, 466 U.S. at 694.

When the court applies the Strickland test, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  "The court's central concern is not with 'grad[ing] counsel's performance,' but with discerning 'whether, despite strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'"  United States v. Aguirre, 912 F.2d 555, 561 (2d Cir. 1990) (internal citation omitted) (quoting Strickland, 466 U.S. at 696).

Although the Strickland test originated for evaluating a claim of ineffective assistance of trial counsel, it has been extended to apply to appellate counsel.  See McKee v. United

- 25 -

States, 167 F.3d 103, 106 (2d Cir. 1999); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).  Appellate counsel is not required to raise all non-frivolous arguments.  Id.  Consequently, it is not sufficient to demonstrate that counsel omitted a non-frivolous argument.  Id.  "[I]ndeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989).  Failure to raise an argument on appeal constitutes ineffective assistance only when the omitted issue is "clearly stronger" and more significant than those presented. Mayo, 13 F.3d at 533.

### 2.  **Application**

Youngblood claims that he was denied the effective assistance of appellate counsel by Lipson's failure to raise two claims: (1) the trial court failed to follow correct procedure in denying Youngblood's Batson challenge, and (2) the trial court erred in refusing the 911 tape recording and Sprint report.  The Appellate Division rejected these very arguments in denying his petition for a writ of error coram nobis.  See Youngblood, 757 N.Y.S.2d at 40.

### a.  **Batson Challenge**

Youngblood asserts that Lipson should have argued on appeal that the prosecution's exercise of peremptory challenges showed a discriminatory pattern of excluding African-American prospective jurors, and that the trial court erred in not providing a remedy.  As discussed above, Youngblood's Batson

- 26 -

not fall below an objective standard of reasonableness because he did not pursue the claim on appeal. This issue is not "clearly a better argument than the issues raised," and is insufficient to sustain a claim of ineffective appellate counsel.

### b. **Excluded Evidence**

Youngblood also contends that Lipson should have appealed the trial court's decision to exclude the 911 call and the Sprint report of Elsie Ruiz's robbery. As discussed above, this claim is without merit. Therefore, Lipson acted reasonably in not pursuing it on appeal.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. Because Youngblood has not made a substantial showing of the denial of a constitutional right, I decline to issue a certificate of appealability. See 28 U.S.C. § 2253 (as amended by AEDPA). I certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this decision would not be taken in good faith. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated:    New York, New York
          December 1, 2006

DENNY CHIN
United States District Judge